# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANNETTE HOGAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PARAMOUNT GLOBAL, f/k/a VIACOMCBS INC., NANCY RAMSEY PHILLIPS, THE PARAMOUNT GLOBAL ADMINISTRATIVE COMMITTEE, THE PARAMOUNT GLOBAL INVESTMENTS COMMITTEE, and JOHN DOES 1-20, <br><br> Defendants. | **CIVIL ACTION NO.**: |

## COMPLAINT

Plaintiff, Annette Hogan, ("Plaintiff"), by and through her attorneys, on behalf of the Paramount Global 401(k) Plan (f/k/a ViacomCBS 401(k) Plan) (the "Plan"),[1] herself and all others similarly situated, states and alleges as follows:

## I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, Paramount Global ("Paramount" or the "Company"), the Paramount Global

---

[1] Effective as of February 16, 2022, ViacomCBS 401(k) Plan was renamed the Paramount Global 401(k) Plan. *See* Amendment No. 4 to the ViacomCBS 401(k) Plan, date December 21, 2022 ("Amendment No. 4"). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Administrative Committee (the "Administrative Committee"), the Paramount Global Investments Committee (the "Investments Committee"), and Nancy Ramsey Phillips (collectively, the Company, the Administrative Committee, the Investments Committee, and Nancy Ramsey Phillips, are referred to as the "Defendants") for breaches of their fiduciary duties.

2.     The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.

3.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 F.Appx. 24 (2nd Cir. 2016).

4.     The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers." [2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    At all times during the Class Period, the Plan had over four billion dollars in assets under management. At the start of the Class Period in 2019, the Plan had $4,004,670,649 in assets under management. *See* 2019 Form 5500 for the Plan ("2019 Form 5500"), Schedule H at 2.

7.    By 2023, the Plan had $6,111,598,456 in assets under management. *See* 2023 Form 5500 for the Plan ("2023 Form 5500"), Schedule H at 2.

8.    The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[4]

9.    As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

10.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 22,641 participants. *See* 2019 Form 5500, at 2. By 2023, the Plan had 34,324 participants. *See* 2023 Form 5500, at 2.

11.    For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b)

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

in the country with between 20,000 and 29,999 participants with account balances. Additionally, there were only 90 retirement plans with between 30,000 and 39,999 participants.

12.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain stable-value investment with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.    Specifically, Defendants allowed substantial assets in the Plan to be invested in a Stable Value Fund ("Paramount SVF"), that invested in synthetic guaranteed investment contracts ("GICs") offered by Transamerica Premier Life Insurance Company, Lincoln National Life Insurance Company, and Prudential Insurance Company of America (the "Insurance Companies"), that provided a significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

14.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

15.    The Insurance Companies benefited significantly from participants in the Plan investing in the Paramount SVF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Paramount SVF was benefitting the Insurance Companies at the expense of the participants in the Plan. The investments in the Paramount SVF were held and invested by the Insurance Companies, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants) when applicable. The crediting rates that the

Insurance Companies provided to the Plan were and are so low that the Insurance Companies reaped a windfall on the spread.

16.     Plaintiff also alleges that Defendants breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

17.     During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to defray reasonable expenses of administering the Plan.

18.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), and failure to monitor fiduciaries (Count III).

## II.    JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

21.     This Court has personal jurisdiction over Defendants because the Plan is administered in this District meaning Paramount transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

22.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Paramount does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.    **PARTIES**

**Plaintiff**

23.     Plaintiff, Annette Hogan ("Hogan"), resides in Chattanooga, TN. During her employment, Plaintiff Hogan participated in the Plan. Ms. Hogan invested in the Paramount SVF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Paramount SVF. Plaintiff Hogan also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Hogan's individual account.

24.    Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25.    Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**<u>Defendants</u>**

***Company Defendant***

26.    Paramount Global is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 1515 Broadway, New York, New York. *See* 2023 Form 5500, at 1, filed with the United States Department of Labor. Paramount operates as a media and entertainment company that produces and distributes content through studios, networks, streaming services, live events, and consumer products.[5]

27.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Through an employee who holds the title Executive Vice President, Chief People Officer appointed the members of the Administrative Committee and the Investments Committee to serve as named fiduciaries of the Plan. *See* ViacomCBS 401(k) Plan, restated effective as of October 1, 2021 ("Plan Doc."), at 56. Under ERISA, fiduciaries with the power to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

---

[5] *See* https://www.paramount.com/about last accessed on February 24, 2025.

28.     Further, at all times, Paramount acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

29.     Accordingly, Paramount during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Administrative and Executive Committees.

### Executive Vice President, Chief People Officer

30.     Nancy Ramsey Phillips ("Phillips") currently serves as the Executive Vice President and Chief People Officer for Paramount Global. Defendant Phillips was appointed to the position of Chief People Officer in December 2019, for ViacomCBS Inc and retained that position after ViacomCBS merged with Paramount Pictures to form Paramount Global in February 2022.

31.     Defendant Phillips was a fiduciary of the Plan because she exercised discretionary control over the management or administration of the Plan with her authority to appoint, retain, and remove plan fiduciaries. *See* Plan Doc., at 56 (As Chief People Officer, Defendant Phillips was responsible "to appoint, remove and replace members of the Administrative Committee and the Investments Committee.").

32.     As a fiduciary with the power to appoint, Defendant Phillips also had a concomitant fiduciary duty to monitor and supervise her appointees.

33.     Accordingly, Defendant Phillips during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had a duty to monitor the actions of the Administrative and Executive Committees.

### The Administrative Committee

34.    "The Administrative Committee shall administer the Plan and shall serve as a Named Fiduciary of the Plan within the meaning of Section 402(a)(2) of ERISA." Plan Doc., at 56.

35.    Each member of the Administrative Committee during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over Plan management and/or authority or control over management or disposition of Plan assets.

36.    Members of the Administrative Committee during the Class Period are collectively referred to herein as the "Administrative Committee Defendants."

*The Investments Committee*

37.    "The Investments Committee shall have discretionary control over the management and disposition of the Plan's assets, and shall serve as a Named Fiduciary within the meaning of Section 402(a)(2) of ERISA." Plan Doc., at 56.

38.    The Investments Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

39.    The Investments Committee and members of the Investments Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Investments Committee Defendants."

IV.    **CLASS ACTION ALLEGATIONS**[6]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because

40.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the Paramount Global 401(k) Plan (f/k/a ViacomCBS 401(k) Plan) at any time between August 27, 2019 to the date of judgment (the "Class Period").[7]

41.     The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 34,324 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

42.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members, and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

43.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiff reserves the right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

C.    The proper form of equitable and injunctive relief; and

D.    The proper measure of monetary relief.

44.    Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

45.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

46.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

47.    "Effective as of October 1, 2021, the 401(k) plan sponsored by Viacom International Inc. (which was a wholly owned subsidiary of Viacom Inc. immediately prior to the 2019 Merger between CBS Corporation and Viacom Inc.) (the "Viacom 401(k) Plan"), and the

assets and liabilities thereunder, shall be merged into the Plan, and the Plan is renamed the ViacomCBS 401(k) Plan." Plan Doc., at 1.

48.     "This Plan constitutes an amendment to and restatement of the CBS 401(k) Plan (now renamed the ViacomCBS 401(k) Plan) and is generally effective as of the beginning of the day on October 1, 2021." *Id.*, at 2.

49.     "The Plan [was] renamed the 'Paramount Global 401(k) Plan'" effective February 16, 2022. Amendment No. 4.

50.     The Plan was adopted for the purpose of providing a way for employees to save for their retirement. *See* Plan Doc. at, 125.

51.     The Plan "is a defined contribution, profit sharing plan." Summary Plan Description ViacomCBS 401(k) Plan, October 1, 2021 ("SPD"), at 1.

52.     Once employees are eligible to participate in the Plan, they "receive enrollment information from Fidelity." SPD, at 6.

53.     Eligible employees will be automatically enrolled in the Plan 60 days after they become eligible to participate in the Plan. *See id.*

54.     Included in the Plan's "Listing of Investment Funds" was the "Stable Value Fund." *Id.*, at 51; *see also* Report of Independent Auditors attached to 2023 Form 5500, at 7 ("Participants have the option of investing contributions to their accounts and their existing account balances among various investment options. These investment options include . . . a stable value fund that consists of synthetic guaranteed investment contracts.").

55.     At the end of 2019, $969,359,000 in Plan assets were invested in the Paramount SVF. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 Form 5500, at S-2.

56.     The Paramount SVF consists of three GICs (Transamerica, Lincoln National, and Prudential). *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 Form 5500, at S-2.[8]

57.     By the end of 2023, over $808 million in Plan assets were invested in the synthetic CIGs in the Paramount SVF. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 Form 5500, at S-2.

58.     The chart below demonstrates the amount of Plan assets invested in the Paramount SVF during the Class Period.

| Plan Year | Plan Assets in Paramount SVF |
|---|---|
| 2019 | $969,359,000 |
| 2020 | $951,081,000 |
| 2021 | $970,787,000 |
| 2022 | $923,878,000 |
| 2023 | $808,236,000 |

*Eligibility*

59.     Employees are typically eligible to participate in the Plan after they are hired by the Company and reach the age of twenty-one. *See* Plan Doc., at 10 ("Each Full-Time Employee of an Employer (other than those subject to special merger provisions provided by Appendix A, or historically under Appendix D) will be eligible to become a Participant on the day he or she attains age 21."); *see also* SPD, at 5 ("All full-time employees who have attained age 21 are eligible to participate in the Plan.").

---

[8] In addition to the three GICS identified, the Paramount SVF also had an underlying investment through State Street Bank and Trust Company ("State Street"). *See id*. The Form 5500s filed during the Class Period did not include a Schedule A for State Street which would have indicated whether the investment was a GIC. Plaintiff may amend the Complaint to include the State Street investment as a challenged fund at the appropriate time if discovery or other information deems it appropriate.

60.    After sixty (60) days of becoming eligible to participate in the Plan, employees are automatically enrolled in the Plan. *See* SPD, at 6 ("If you do not take any action within 60 days, you will be automatically enrolled in the Plan and be deemed to have elected to contribute 6% of your eligible Compensation as a Before-Tax Contribution.").

### *Contributions*

61.    Eligible employees can make the following types of contributions to their Plan accounts: "(1) Before-Tax Contributions, (2) Roth 401(k) Contributions, and (3) After-Tax Contributions." SPD, at 3.

62.    The Company also provides additional contributions to participant Plan accounts. *See* SPD, at 3 ("<u>Company Match</u>: For your Before-Tax Contributions and Roth 401(k) Contributions, ViacomCBS will match amounts you contribute (up to a limit). ViacomCBS will fully match the first 1% of your eligible pay that you contribute and will also match 80% of the contributions you make on the next 5% of your eligible pay."); *see also id*., at 4 ("<u>Company Profit Sharing</u>: In its discretion each year, ViacomCBS may provide an annual profit sharing contribution to your account.").

### *Vesting*

63.    Employees are 100% vested in their contributions to their Plan account. *See* SPD, at 9 ("You will always have a non-forfeitable right to the amounts you contribute from your own Compensation."); *see also id*., at 24 ("You are always 100% vested in your own contributions (*i.e.*, Before-Tax Contributions, Roth 401(k) Contributions, After-Tax Contributions, Catch-Up Contributions, and Rollover Contributions), and the investment earnings associated with those contributions.").

64.     Employees are 100% vested in Company contributions after two years of service. *See* SPD, at 24 ("You will become vested in the Company contributions (and the investment earnings on these contributions) if you complete two years of Vesting Service. … Once you complete two years of Vesting Service, you will be fully vested in your Plan account.").

### Forfeitures

65.     "If you are not 100% vested when your employment terminates and receive distribution of all vested account balances, your non-vested interest in your Company contributions (and any investment earnings thereon) will be forfeited as soon as practicable after your vested Plan benefit is paid to you." SPD, at 25; *see also* Plan Doc., at 44 ("If a Participant terminates employment prior to the date on which he or she is fully vested in his or her Account and receives a distribution of such Account, the non-vested portion of his or her Account shall be forfeited.").

66.     Forfeited amounts are to be "used as soon as practicable to reduce future Matching Employer Contributions and Nonelective Employer Contributions, to defray administrative expenses of the Plan, to correct an error made in allocating amounts to Participant's Accounts or resolve any claim filed under the Plan in accordance with Section 12.6, and to restore Participants' Accounts in accordance with Section 10.3(b)." Plan Doc., at 44.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

67.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

68.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

69.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

70.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

71.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

72.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

73.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

74.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

75.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

76.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

77.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

78.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

(and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

79.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff wrote to the Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto" and "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," as well as any committee's meeting minutes. This request was made on September 11, 2024.

80.     By letter dated October 10, 2024, the Plan's administrator responded to Plaintiff's request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiff's request.

81.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

18

82.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

83.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Paramount SVF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Paramount SVF**

84.    A stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[10] In other words, the overarching goal of all stable value funds is to preserve capital.

85.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[11]

86.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account); a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

---

[10] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[11] *Id.*

87.     Additionally, as indicated above, the Plan was invested in a proprietary stable value fund which included a GIC managed by Prudential, then Empower when it bought Prudential's business.

### 1.     The Plan's Inclusion of the Paramount SVF

88.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Paramount SVF.

89.     Prudential established the crediting rates for the Paramount SVF with the Plan.

90.     Prudential, in most cases, earns a "spread" equal to the difference between the crediting rate and the returns Prudential earns on the funds in the account.

### 2.     Prudential is at a Substantial Risk of Going Insolvent

#### a.     The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

91.     Because a guaranteed insurance account product is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

92.     A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See*    https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

93.    The SEC's reference to reliable credit risk models is instructive.  It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[12]

94.    These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

### b.    Recent Lawsuits Have Highlighted Prudential's Extreme Risk of Going Insolvent

95.    Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

---

[12] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/.

96.    A recently filed lawsuit explained that a "cursory review of [Prudential's] statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda." *See Dempsey et al. v. Verizon Communications Inc. et al.*, No. 1:24-cv-10004-AKH (S.D.N.Y. Dec. 30, 2024) at ¶ 53.

97.    The lawsuit further explained, among other things, that Prudential's surplus of $16 billion as of the end of 2023 paled in comparison to the alleged potential liabilities of $72.8 billion in affiliated party reinsurance and modified co-insurance ("Modco"). *Id.* at ¶¶ 53-54.  In other words, given the meager surplus compared to the potential liabilities put Prudential at an extreme risk of insolvency.

**c.    Empower's takeover of Prudential Did Not Alleviate the Severe Risk of Insolvency**

98.    "On April 1, 2022, [Empower Annuity Insurance Company of America] completed the acquisition of all the voting equity interests in Prudential Retirement Insurance and Annuity Company, and subsequently renamed the entity to Empower Annuity Insurance Company, as part of the acquisition of …Prudential's Full Service retirement business."  Annual Statement for the Year 2024 of Empower Annuity Insurance Company of America, Notes to Financial Statements.

99.     As noted above, available surplus is an important data point in determining an L&A carrier's insolvency risk. Based on its insufficient surplus, Prudential/Empower was/is at severe risk of insolvency.

100.    To begin, an important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period,

Empower (and before it, Prudential), had an alarmingly low S/L ratio. For example, as of 2024, Empower's S/L ratio was less than 1%:



Table from ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company — LIABILITIES, SURPLUS AND OTHER FUNDS:

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $         ) | | |
| 36.2 | shares preferred (value included in Line 30 $         ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $         in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:  $    1,018,399,778   EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:      0.96%**      National Average is About **7.5%**.

101.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower. For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:



| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $         ) | | |
| 36.2 | shares preferred (value included in Line 30 $         ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $         in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus:  $   26,427,441,247   EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $ 218,473,153,964   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:      12.10%**      National Average is About **7.5%**.

**d.    Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

23

102.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



103.    Separate and in addition to the reserve credit reported above, Empower has also entered into a ModCo reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



104.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



105.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[13]

106.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are

---

[13] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[14] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions.  *See* n. 17.

> **e. Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid and Affiliated Investment Concentrations**

107.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

108.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[14] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



109.    Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

110.    In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 3.    There are Many GICs in the Marketplace with Competitive Crediting Rates

111.    There are other reasons why the Paramount SVF was imprudent.

112.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

113.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

114.    The Paramount SVF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[15] |
|------|-----------|---------------------|-------------|-------------------|-------------------|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company (but multiple underlying contracts) | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |

---

[15] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Paramount 401(k) Plan** | **22,641** | **$4,004,670,649** | **Lincoln National** | **2.81%** |
| | | | | **Prudential** | **2.87%** |
| | | | | **Transamerica** | **3.07%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Paramount 401(k) Plan** | **22,055** | **$4,222,395,480** | **Lincoln National** | **2.59%** |
| | | | | **Prudential** | **2.64%** |
| | | | | **Transamerica** | **2.85%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Paramount 401(k) Plan** | **34,197** | **$6,498,863,097** | **Lincoln National** | **1.87%** |
| | | | | **Prudential** | **1.92%** |
| | | | | **Transamerica** | **2.11%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Paramount 401(k) Plan** | **35,582** | **$5,367,752,256** | **Lincoln National** | **2.18%** |
| | | | | **Prudential** | **2.12%** |

| | | | | Transamerica | 2.17% |
|---|---|---|---|---|---|
| | ████████████████████████████████████████ | | | | |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | Paramount 401(k) Plan | 34,324 | $6,111,598,456 | Lincoln National | 2.68% |
| | | | | Prudential | 2.86% |
| | | | | Transamerica | 2.65% |

115.    Throughout the Class Period, the Paramount SVF underperformed the comparator funds by an average of over 36% as demonstrated in the table below.

| Year | Paramount SVF Average Rate of Return | Comparator Average Rate of Return | Paramount SVF Percentage of Underperformance |
|---|---|---|---|
| 2019 | 2.92% | 3.94% | 25.89% |
| 2020 | 2.69% | 3.75% | 28.27% |
| 2021 | 1.97% | 4.19% | 52.98% |
| 2022 | 2.16% | 4.13% | 47.70% |
| 2023 | 2.73% | 3.85% | 29.09% |
| Average Underperformance during Class Period | | | 36.79% |

116.    In short, because the Plan held over $4 billion in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

117.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

118.    By selecting the Paramount SVF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

119.    With the massive amount of assets under management in the Paramount SVF, the losses suffered by Plan participants were devastating.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[16]

C.    **Defendants Improperly Reduced Paramount's Plan Contributions Through Forfeiture Accounts**

120.    During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Paramount's benefit and to the detriment of Plan participants.

121.    As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan. *See* Plan Doc., at 44.

---

[16] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

122.    Using the forfeitures to reduce Paramount's contributions is always in the best interest of Paramount because that option would decrease its own contribution costs.

123.    Absent any risk that Paramount would be unable to satisfy its contribution obligations, using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

124.    In deciding between using forfeitures to benefit Paramount or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of the Plan's assets.

125.    Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries.

126.    Defendants did not, for example, investigate whether there was a risk that Paramount would be unable to satisfy its contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to participants and still offset a portion of Paramount's own contribution obligations, as a prudent person would have done.

127.    Defendants also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

128.    Although ERISA requires fiduciaries to manage the Plan's assets solely in the interest of participants and although the Plan grants Defendants discretion to use forfeitures to pay Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to

cover such expenses, Defendants have consistently declined to use the Plan's assets for such purpose during the putative Class Period.

129.    Since at least the beginning of the Class Period, Defendants have disloyally used forfeited non-vested Plan assets for Paramount's benefit to disproportionately reduce future employer contributions compared to offsetting Plan expenses.

130.    According to information from the Plan's Form 5500, the following represents the amount of the forfeitures improperly used to offset Paramount's contributions to the Plan, and the amounts used to pay for Plan administration expenses:

| Plan Year | Forfeiture Amounts | Company Contributions | Offset Plan Expenses |
|---|---|---|---|
| 2019 | $22,000 | $2,500,000 | $363,000 |
| 2020 | $831,000 | $1,400,000 | $226,000 |
| 2021 | $6,400,000 | | $449,000 |
| 2022 | $4,800,000 | $8,000,000 | $570,496 |
| 2023 | $4,000,000 | $4,900,000 | $626,117 |
| **Total** | | **$16,800,000** | **$2,234,613** |

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(Against Administrative Committee and Investments Committee Defendants)**

131.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

132.    At all relevant times, the Administrative Committee and its members, and the Investments Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

133.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

134.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

136.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

137.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
## Breach of Fiduciary Duty of Loyalty
### (Asserted against the Company, the Committee Defendants and the Chief People Officer)

138.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

139.    At all relevant times, the Company, the Committee Defendants, and the Chief People Officer ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

140.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

141.    The Loyalty Defendants were required to discharge their duties to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

142.    The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

143.    The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

144.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

145.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in his Prayer for Relief.

146.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).Adsfa

## COUNT III
## Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Company Defendant and the Chief People Officer)

147.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

148.    Paramount and the Chief People Officer (the "Monitoring Defendants") had the authority to appoint and remove members of the Administrative Committee and Investments Committee, and the duty to monitor the Administrative Committee and Investments Committee and were aware that the Administrative Committee and Investments Committee Defendants had critical responsibilities as fiduciaries of the Plan.

149.    In light of this authority, the Monitoring Defendants had a duty to monitor the Administrative Committee and Investments Committee Defendants to ensure that the Administrative Committee and Investments Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Administrative Committee and Investments Committee Defendants were not fulfilling those duties.

150.    The Monitoring Defendants also had a duty to ensure that the Administrative Committee and Investments Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendant.

151.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Administrative Committee and Investments Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Administrative Committee and Investments Committee Defendants' imprudent actions; and

    (b)    failing to remove Administrative Committee and Investments Committee members whose performance was inadequate, all to the detriment of the Plan and Plan's participants' retirement savings.

152.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

153.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Administrative Committee and Investments Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or

fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: August 27, 2025                          Respectfully submitted,

                                                */s/ Mark K. Gyandoh*
                                                Mark K. Gyandoh, Esquire
                                                (*Pro Hac Vice* to be Request)
                                                James A. Maro, Esquire
                                                (*Pro Hac Vice* to be Request)
                                                **CAPOZZI ADLER, P.C.**
                                                312 Old Lancaster Road
                                                Merion Station, PA 19066
                                                Email: markg@capozziadler.com
                                                         jamesm@capozziadler.com
                                                Tel.: (610) 890-0200
                                                Fax: (717) 232-3080

                                                *Counsel for Plaintiff and the Putative Class*